[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
In this action for post-conviction relief, the petitioner, Jeffrey Washington, challenges his conviction after trial by jury in May 1989 for felony murder for his rape and the resulting death of Alice Carcieri, a 73 year-old double amputee, and his sentence, imposed by the Court upon the jury's finding of aggravated battery, of life without the possibility of parole. Mr. Washington now contends — after the death of his counsel, Richard M. Casparian, and the retirement of Rhode Island Superior Court Justice Thomas J. Caldarone, Jr. who presided over his trial — that he was denied effective assistance of counsel. He argues that Mr. Casparian: (1) failed to present at trial a defense of diminished capacity due to the defendant's voluntary intoxication and likewise failed to present evidence thereof at sentencing for mitigation purposes; (2) broke his promise to the jury that the defendant would testify; and (3) denied him his constitutional right to testify. Petitioner also faults the Court for not securing a waiver of his right to testify on the record and for other errors of law at trial, criticizes the racial composition of his jury and contends that the State failed to disclose to him during discovery evidence relevant to a defense of diminished capacity. He seeks a new trial or a reduction in sentence to one of life with the possibility of parole.
After consideration of the full transcript of the trial proceedings, the exhibits introduced at trial, the Rhode Island Supreme Court's decision in State v. Washington, 581 A.2d 1031 (R.I. 1990), that affirmed the defendant's conviction and sentence, his petition for post-conviction relief filed on his behalf through counsel, as supplemented, and the State's answers thereto, the record of the evidentiary hearing on the petition, and the legal arguments of counsel, this Court denies Mr. Washington's petition for post-conviction relief in its entirety.[1]
 FACTUAL BACKGROUND
The following facts are based upon the Rhode Island Supreme Court's decision in State v. Washington, 581 A.2d 1031 (R.I. 1990), that denied Mr. Washington's appeal, and the 1989 trial record. On Christmas day in 1987, Jeffrey Washington entered an unlocked back door to the house of Alice Carcieri, who was entertaining family members and friends until late in the evening, and hid in her cellar. Mr. Washington knew Ms. Carcieri, a 73 year-old double amputee, because her brother-in-law employed him and the defendant occasionally cleaned her house. While hiding in the cellar, Mr. Washington ate, slept, smoked crack, and urinated and defecated in a bucket. After the guests had left, Mr. Washington went upstairs into Ms. Carcieri's bedroom where she was sleeping. He threw bedclothes over her head and tied her hands to the bedposts with rope he brought up from the basement. Ms. Carcieri awoke and yelled once. Mr. Washington then removed her panties and raped her. Ms. Carcieri struggled a little and then went limp.
To create the appearance of a burglary, Mr. Washington ransacked the bedroom and took an envelope from the table. He then fled the scene. Either during the rape or shortly thereafter, Ms. Carcieri died from heart failure, still tied to the bedposts. She was discovered by family members the next morning who then summoned the police to the scene.
The following day, after learning of the death of Ms. Carcieri, Mr. Washington discarded the clothes he had been wearing during the crime, stole a car, and drove to New York. He was arrested in Riverhead, Long Island on December 29, 1987, three days after the rape and death of Ms. Carcieri, for attempting to steal a wallet. While in custody in New York, Mr. Washington informed the Riverhead police of his involvement in the death of Ms. Carcieri. On December 30, 1987, after being contacted by the police in New York, the Providence police responded to New York and obtained from Mr. Washington a full and detailed confession to the rape of Ms. Carcieri that included admissions to all of the facts summarized above in this decision. He explained in his confession that he felt really bad for Ms. Carcieri on the night in question because she had said she had nobody and that he thought he was doing something good for her. He expressed his remorse for what happened and indicated that he never meant to hurt her.
 PROCEDURAL HISTORY
On January 21, 1988, Mr. Washington, having waived extradition from New York, was brought back to Rhode Island and arraigned on charges of murder and rape. On April 15, 1988, the Grand Jury indicted Mr. Washington on a charge of murder of Alice Carcieri, in violation of R.I. Gen. Laws §§11-23-1 and 11-23-2. Before arraignment and in accordance with R.I. Gen. Laws § 12-19.2-1, the State filed notice of its intention to seek a sentence of life without the possibility of parole.
Discovery
Discovery ensued. On May 12, 1988, the State provided the defense with the customary witness list and witness statements, in addition to evidentiary documents and reports. The attachments included the confession given by the defendant to the police, letters the defendant had written to the victim's family, witness statements,[2] police statements,[3] seizure reports,[4] the dispatch report dated December 26, 1987 (upon call from Elenora Carcieri), the arrest warrant and affidavit dated December 29, 1987, and an undated police narrative.
The police narrative details the police response and findings at the scene of the crime on the morning of December 26, 1987. It states that the police were dispatched to the scene at approximately 10:25 a.m. Upon arriving, the police found the deceased, an elderly, female, double amputee, lying on her bed, both hands tied to the headboard bedposts and bedclothes over her head, apparently the victim of a sexual assault. A Schweppes bottle cap was also discovered on the bed, near the victim's feet. Drs. Perrotti and Sweeney of the Medical Examiner's Office responded to notification by the police and later classified the death as a homicide. There were no signs of forcible entry into the home. Family members also were present and identified the deceased as 73 year-old Alice Carcieri.
The narrative explains that the family members informed the police that the previous night Alice had entertained guests for the holiday. She was last seen alive at around midnight that evening. Her body had been discovered by her sister-in-law, Elenora Carcieri, at around 10:00 a.m. Due to the lack of indications of forcible entry, the police inquired as to who had access to the home or to whom Alice Carcieri may have allowed entry. The family identified Jeffrey Washington, who had known the family for a long time and cleaned and did odd jobs for Alice. He was last known to have been at the house on December 23, 1987. The family also explained that the backdoor had been left unlocked to allow the guests entry for the festivities the previous day.
The narrative also details how further investigation of the home led the police to the basement where recently opened cans of food were discovered in a small trash can. Elenora Carcieri indicated that the trash can was empty when she saw it on Christmas morning. The police also found another can of recently opened food and an opened and partially consumed bottle of Schweppes Ginger Ale. These items were discovered near a rope, similar to that used to bind the victim to the bedposts. Further search of the basement led to the discovery of a bucket apparently containing human urine and feces. Nearby, a cloth was found also apparently with feces on it. These items were seized and transported to the Providence Police Bureau of Criminal Investigation for examination. Analysis of a fingerprint found on a tuna fish can that was seized was identified as a print of Jeffrey Washington. A picture of him was shown to the family and they confirmed he was the Jeffrey Washington employed by the family.
The narrative states that police attempted to locate Jeffrey Washington through his family and friends but were unsuccessful. On December 29, 1987, the Providence police received a teletype from the Riverhead Long Island police in New York, indicating they had Mr. Washington in custody for robbery and possession of a stolen car from Rhode Island. The teletype also indicated that Mr. Washington had stated that he was wanted for questioning by the Providence police regarding the murder of a woman named Alice in Providence. Also on December 29, 1987, the Providence police issued an arrest warrant for Jeffrey Washington for the crime of murder.
According to the narrative, on December 30, 1987, Providence police detectives, Sergeant Bruckshaw, Detective John Cullen, and Detective Keith Tucker, traveled to New York to interview Mr. Washington. He was advised of his rights, interviewed, and provided the police with a signed confession regarding the murder of Ms. Carcieri on December 26, 1987. On January 21, 1988, Mr. Washington waived extradition and was returned to Rhode Island. He was charged with murder, arraigned, and held without bail.
Finally, the narrative catalogues that since his arrest, Mr. Washington sent two letters to the victim's family expressing remorse for his actions. Those letters were turned over to the Providence Police Department.
Copies of these letters were included in the discovery response. In the first letter, postmarked January 20, 1988, Mr. Washington describes to Mr. and Mrs. Vicario (the victim's sister and brother-in-law) in great detail the circumstances leading up to, during, and after his commission of the sexual assault. He tells them how Alice had been upset and crying the day he had come to clean for her: "she told me that she never had know body to love and know body ever made love to her." He tells the family he "felt so bad." He then writes that he came to check on her on Christmas Day and she was upset again and thought no one really cared for her. He writes, "that hurt me deeply so deeply it brought tears to my eyes. because I loved her and all of you guys because you's were allways there when I needed you's. So I figure she was talking about sex. In if that all she needed that was nothing so I went down to the celler and fell asleep and when I woke up I when up stairs to her bed room and first I covered her so she couldn't see me then I tied her up when she started to scream about two time and then she stop it was like she expected something to heppen. then she say thank Jesus and went limp." Mr. Washington then writes that he learned the next day that she died and "that got me." So he tells them he ran to New York but stopped "because it hurt me so bad. And I knew I had to face up to it so I got in trouble And I told the police everything . . ." He ends the letter with, "Vinny I love you's and I'm very sorry. And I hope you's can't find it in your hearts to forgive me."
In the second letter to Mr. Vicario, postmarked February 23, 1988, Mr. Washington writes how he was "wishing this was all a dream. But its not and I'm so sorry for what I did." He also tells Mr. Vicario that his lawyer told him that he "did the right thing by telling the police about everything that I had done." He also writes that he told his wife everything he had done and she had told him to tell the truth. Finally, he asks Mr. Vicario to do him a favor by coming to the trial, "because I'm going to tell the truth every word of it and it would mean a lot to me to see your face one more time. . . ."
The State provided the defense with the copy of a report identifying the defendant's fingerprints on both pages of the January 20, 1988 letter. The report, dated May 2, 1988, was produced by the Latent Fingerprint Section of the Identification Division of the Federal Bureau of Investigation (FBI).
The State also included in its response a copy of the autopsy report, produced by Medical Examiner Kristen Sweeney, on December 26 and 27, 1987. The report includes findings of ligature marks on the left wrist and right forearm, contusions on the shoulders, a small abrasion on the left upper neck, and contusions and lacerations of the vagina. The vaginal smear tested positive for spermatozoa and negative for acid phosphatase. The report also states that Ms. Carcieri was suffering from arteriosclerotic cardiovascular disease and classifies the manner of death as a homicide, stating that the cause was acute and chronic congestive heart failure that occurred while restrained during the assault.
A copy of the signed confession also was included in the State's answer. The confession was provided by the defendant to the Providence police on December 30, 1987 in Riverhead New York.[5] In his confession, Mr. Washington details the events leading up to the crime. He describes how he had been at Ms. Carcieri's house on Wednesday and that she was very depressed about the holidays and being alone. He repeatedly states, "I felt really bad for her" or "I felt bad" and "no matter how high I got I still couldn't shake the feeling." He then tells the police that he returned to her house on Friday "thinking maybe I could make her feel better." He says that he entered the house from the unlocked back door and went into the cellar where he "ate some beans and some canned fruit and tuna fish. I grabbed a bottle of ginger ale to drink. After that I smoked some crack or coke whatever it was and then I went upstairs." He then describes the rape as follows:
 "When I got upstairs I went into the room and I covered her head with the blanket and she woke up and I tied her hands to the posts of the bed. I had the rope with me from down cellar. She yelled once but then she stopped yelling. I got on the bed and I took her panties off and I took my pants down and I made love to her. She was struggling a little bit and then she said "Thank you, Jesus" and I thought she passed out. After I finished I pulled out some draws to make it look like some one else had come into the house. I took an envelope from the table by the stove and to make it look like someone had taken some money and I left by way of the front door. I couldn't go home because I felt so guilty I couldn't face my wife. I didn't find out intil the next day that Alice was dead. I thought she was passed out."
Mr. Washington then describes how he changed clothes, throwing the ones he wore during the rape in the dumpster, and proceeded to get high the next few days. He states that on Monday he stole a car so he could "get away to think." When asked why he tied Alice's hands, he responded, "So I could do what I was doing. I didn't want her to know it was me and I didn't want her to pull the covers off her face." He is then asked if he went to the bathroom in the cellar and answers that he did, "in a bucket in the cellar. I wiped myself with a cloth." The police also asked the defendant if he was aware he was committing a crime when he forced himself on Alice. He replies, "Yes, but I thought I was doing something good for her because she had said she had nobody I thought she could have meant sexually love her." He adds to his statement, "I really felt bad for her. I loved her and I thought I was doing something good for her because I was feeling so bad for her. I'm sorry what had happened I didn't mean to hurt her."
On April 4, 1989, the State filed a Supplemental Answer to the defendant's discovery motions.[6] It informed the defense that two experts may be called to testify at trial and summarizes the substance of the testimony. It stated that Dr. Lester Grinspoon, an Associate Professor of Psychiatry at Harvard Medical School, would testify that in his opinion, the defendant was not suffering from cocaine addiction at the time he committed the crime. He further would testify that the defendant's behavior relating to the commission of the crime does not indicate a level of intoxication to establish a diminished capacity sufficient to negate the specific intent to torture or commit an aggravated battery upon the victim.
The second witness the State indicated it could present at trial was Dr. Ronald Stewart, a forensic psychiatrist at the Institute of Mental Health. Dr. Stewart would testify as to his opinion of the defendant's criminal responsibility for his actions against Ms. Carcieri, based on an interview he conducted with the defendant. In the interview, the defendant acknowledges that he knew it was wrong to have sex with her. He told Dr. Stewart, "I would just as soon take the death penalty. I said to my lawyer I didn't want to stay in jail the rest of my life. I would rather have the death penalty." A transcript of the interview was attached to the Supplemental Answer.
On April 25, 1989, the State provided a final Supplemental Answer to the discovery response. Attached to it was a copy of an FBI report of analysis conducted on evidence found at the scene. The report, dated July 25, 1988, confirms the presence of semen and of the victim's blood on the victim's bedding. It also states that the hair found on the floor around the bed and on the bed sheets was consistent with the hair of the defendant. There is no evidence in the report that any of the contents of the human waste found in the bucket were sent to the FBI for analysis. The report simply states, "It is pointed out that the FBI laboratory does not conduct any examinations regarding the conclusive identification of fecal material." There is no evidence in the pre-trial or trial record as to any other seizures of forensic evidence from the defendant or FBI reports or forensic testing.
There are no discovery requests filed by the defense to the State's discovery request in the court file or the post-conviction record.
Likely pursuant to conversations between the parties prior to trial, the defense agreed to three stipulations regarding the physical evidence found at the scene. Stipulations No. 1, 2, and 3 were signed on the second day of trial and introduced as full evidence on the third day of trial. They indicate that the parties agree to the findings of the FBI analysis conducted on the evidence.[7]
Trial
The trial proceedings of Jeffery Washington began on April 24, 1989, with the empanelment of the jury, and ended on June 27, 1989, with sentencing. The individual voir dire process was not transcribed. Opening arguments commenced on May 1, 1989 and the penalty phase concluded on May 23, 1989. Richard M. Casparian, Chief Public Defender of the Rhode Island Public Defender's Office, represented the defendant, Robert E. Craven represented the State and Justice Thomas J. Caldarone, Jr. presided over the trial.
The State presented its case, arguing that Mr. Washington was guilty of first-degree felony murder because he raped Ms. Carcieri, the trauma of which resulted in her death by congestive heart failure. To support its theory of the case, the State introduced the physical evidence seized from the scene, as detailed in the reports and documents produced during discovery.[8] The three stipulations agreed to by the defense also were introduced into evidence.
To further support its case, the State provided testimony of the victim's friends and family who were with her on Christmas Day and who were at the scene when the police arrived.[9] The testimony provided by these witnesses was consistent with the statements provided to the police and presented to the defense during discovery.
The State also provided the testimony of various police officers, detectives, and analysts involved in the investigation of the crime.[10]
One of the witnesses was Detective Persson who provided testimony corroborating the findings of the FBI analysis, which was agreed upon in Stipulations No. 1, 2, and 3. Trial Tr. 144-175. During direct examination, Detective Persson was asked about the bucket of human waste found in the cellar. The State asked, "Did you try to make any comparisons between what was in that [the bucket] and anything else?" Detective Persson replied, "Yes. I contacted the FBI laboratories." At this point, defense counsel objected, citing relevance and also declaring that it was "the first time I've heard of it. It wasn't in the discovery." Justice Caldarone overruled the objection for the moment and the witness was asked again if any comparison was attempted between what was in the bucket and anything else. Detective Persson answered, "Yes sir. We attempted to make a comparison. However, the FBI laboratory in Washington stated no analysis or comparisons could be made." Justice Caldarone replied, "All right" and no further objection was made by defense counsel. Trial Tr. 173-174. This testimony of Detective Persson is consistent with the report of the FBI, provided during discovery to the defense in the third Supplemental Answer, which stated, "the FBI laboratory does not conduct any examinations regarding the conclusive identification of fecal material." It appears that defense counsel did not present any further objections to the testimony because it was consistent with the information provided during discovery.
The State also presented the testimony of Dr. Kristen Sweeney, who had conducted the autopsy on the victim. Dr. Sweeney testified that Ms. Carcieri was suffering from severe heart disease and that she died from chronic congestive heart disease. Trial Tr. 230. She also testified as to her classification of the death as a homicide, explaining that the sexual assault was the contributing cause of death. Trial Tr. 233, 239. After presenting Dr. Sweeney's testimony, the State rested its case.
Due to the overwhelming evidence indicating that the defendant was the rapist, including Mr. Washington's own statements of guilt he made to the family, the police, and Dr. Stewart, and his willingness to testify to as much, Mr. Casparian was limited in his options for a defense strategy. It does appear from the record that Mr. Casparian considered a defense of diminished capacity but found that it was not an appropriate defense and counseled his client as such. It is further clear that Mr. Washington assented to his counsel's advice and chose not to pursue a theory of diminished capacity. Defense counsel told the Court, "Going back several weeks, I think it was clear on the record that this was not a diminished capacity case. That has been discussed with Jeffrey, discussed again today." Trial Tr. 385.
In the absence of the possibility of that defense, Mr. Casparian appears to have adopted a two-pronged defense. First, defense counsel challenged the causal connection between the rape and the death so as to destroy the possibility of a finding of first-degree felony murder. Second, Mr. Casparian attempted to challenge the construction of the felony-murder statute by interpreting it to require the state to prove "malice aforethought", which is one of the elements required to establish first-degree murder.
To buttress this defense, Mr. Casparian argued that Mr. Washington was remorseful and full of guilt for committing the crime. During opening arguments, Mr. Casparian told the jury that Mr. Washington would take the stand to testify as to his state of mind before, during, and after the rape. Trial Tr. 15. As the State presented its witnesses, Mr. Casparian's cross-examinations of witnesses also aided in establishing the defendant's state of mind.
The defense then chose to rest without presenting its own evidence or calling Mr. Washington to the stand. Mr. Casparian stated:
 "I just want to say that we are going to rest in the presence of the jury. However, I do want to state for the record that the Court was kind enough to allow me to continue one half hour later this morning, and I used that time to discuss certain matters with Mr. Washington, and after consulting with him and conversing together in the cell block in the building, we are prepared to rest at this time in the presence of the jury. Is that correct, Jeffrey?"
The defendant replied, "Yes." Trial Tr. 272-273.
In his closing argument, Mr. Casparian explained to the jury why Mr. Washington didn't take the stand, saying that "he didn't take the stand because he has already testified in this case." Trial Tr. 282. He further explained that Mr. Washington's testimony was presented through the statements, in evidence, made to the police and the family. Trial Tr. 282, 283, 285-288. He even read to the jury the two letters Mr. Washington wrote to the family, highlighting the state of mind of the defendant. Trial Tr. 285-288. He then stated, "The point is, he has testified." Trial Tr. 288. Mr. Casparian also argued to the jury that the State failed to prove that the sexual assault was the proximate cause of the death, thereby failing to prove the charge of felony murder. Trial Tr. 288-292.
The case then went to the jury for deliberations. The Court instructed the jury on the charge of first-degree felony murder, telling the jury that it needed only to find, beyond a reasonable doubt, that the defendant raped Alice Carcieri and that the rape was a proximate cause of her death for them to convict him of that charge. Trial Tr. 315-316. The Court also instructed the jury on the lesser-included offense of first-degree sexual assault. Trial Tr. 316-317. In addition to these instructions, the Court also cautioned the jury not to draw any inference of guilt based on the defendant's exercising his Fifth Amendment right against self-incrimination in not testifying. Trial Tr. Pgs. 305, 306. Despite the efforts of Mr. Casparian, the jury returned a verdict of guilty on the charge of first-degree felony murder, and the trial moved to the penalty phase for a determination of aggravating circumstances.
Penalty Phase
During the penalty phase, the jury was asked to consider if the aggravating circumstances of aggravated battery and torture were present in the commission of the crime. No new evidence was presented but the State and defense presented argument to the jury. The jury returned a finding of aggravated battery but did not reach a verdict as to torture. Trial Tr. 358-359.
Sentencing
On June 27, 1989, the defendant appeared before Justice Caldarone for sentencing. Justice Caldarone asked for any evidence or testimony to be presented regarding aggravating or mitigating circumstances for his consideration in sentencing. At that time, the State inquired as to whether the defense will present any testimony of diminished capacity as a mitigating factor or to be considered by the Court as negation of the specific intent that may be required to support the finding of aggravated battery.[11] Trial Tr. 383-384. There appeared to be concern by the State regarding what it found to be a completely incredible comment made by the defendant to the probation officer in preparation of the pre-sentence report, when he was not under oath, indicating that he may not quite remember what happened the evening he committed the crime and that he was having doubts about whether he committed the crime.[12]
Trial Tr. 392-393. Mr. Casparian responded that this is clearly not a case of diminished capacity and that such fact had been discussed with his client. Trial Tr. 385. Instead, Mr. Casparian argued that a finding of aggravation would not fit the circumstances of the crime and focused his argument of mitigation on the defendant's remorse, highlighting that he was taking responsibility for his actions. Trial Tr. 396-402. The Court, however, was not persuaded and clearly rejected any notion of diminished capacity as a possible mitigating factor. Trial Tr. 410-413. Instead, Justice Caldarone upheld the finding of aggravated battery and also found aggravated torture. Trial Tr. 410. Accordingly, the Court sentenced Jeffrey Washington to a term of life in prison without the possibility of parole. Trial Tr. 416.
Direct Appeal
Mr. Washington appealed both his conviction and his sentence to the Rhode Island Supreme Court, seeking a reduction of sentence, remand for re-sentencing, and a new trial. Mr. Casparian and Ms. Barbara Hurst, also of the Public Defender's Office, represented Mr. Washington on his appeal. The Supreme Court denied the appeal on November 2, 1990. See Statev. Washington, 581 A.2d 1031 (R.I. 1990).
Post-Conviction Relief Proceedings
On April 2, 1998 — over a decade after the rape and death of Alice Carcieri, almost a decade after the Supreme Court's denial of his appeal, four years after the 1994 retirement of Justice Caldarone, and most significantly, soon after the March 1997 death of his prior trial counsel, Mr. Casparian — Mr. Washington filed pro se a motion for post-conviction relief, pursuant to the Post-Conviction Relief Act, claiming a violation of his Fifth, Sixth, and Fourteenth Amendment rights, primarily through the alleged ineffective assistance of counsel, Mr. Casparian.[13] Since then various counsel have been appointed by the Court to represent the defendant in connection with the Petition.
On January 1, 2003, the defendant's current counsel, Leo Manfred, filed a petition alleging ineffective assistance of counsel through violation of the defendant's right to testify and a failure by counsel to pursue the defense of diminished capacity, including failure to obtain test results on the bucket of human waste, which would have allegedly supported the defense of diminished capacity. The State filed its response on March 3, 2003, denying both claims.
The State supplemented that answer on April 3, 2003 and included a copy of the defendant's confession and January 1988 letter to Mr. Vicario to support its denial of the claims. On April 7, 2003, the State further supplemented its response with an affidavit, dated April 1, 2003, from Nancy Haley, M.S., Supervisor of the Forensic Toxicology Laboratory of the Rhode Island Department of Health. In her affidavit, Ms. Haley states that testing of urine or feces cannot "reveal an individual's impairment by ethanol and/or drugs." She further states that only testing of the blood would reveal such information. The State also attached a copy of its April 3, 1989 Supplemental Answer to the defendant's pre-trial discovery request that summarizes the possible testimony of Dr. Grinspoon (indicating the evidence does not support a diminished capacity defense), including a copy of the transcript of the defendant's interview with Dr. Stewart.
On September 29, 2003, Mr. Manfred filed a response on behalf of the defendant and added the claim of counsel breaking his promise to the jury that the defendant would testify. Then on January 27, 2004, Mr. Manfred filed a complete, new application (encompassing his prior petitions in this case) that is currently before this Court for its consideration (the "Petition"). The State filed its Supplemental Answer to the Petition on March 26, 2004.
In the Petition, Mr. Washington alleges his counsel: (1) failed to present the defense of diminished capacity at trial or evidence thereof for mitigation purposes at sentencing, (2) broke a promise he made to the defendant and the jury that defendant would testify, and (3) denied him his constitutional right to testify. The defendant also claims (1) the State failed to disclose to the defense during discovery evidence relevant to a defense of diminished capacity, (2) judicial error regarding the defendant's waiver of his right to testify, (3) judicial error in the finding of aggravation and definition of "malicious" as it applies to aggravated battery, and (4) under-representation of minorities on the jury. Mr. Washington claims these errors prejudiced his right to a fair trial. He seeks either a new trial or a reduction of his sentence from life without the possibility of parole to life with the possibility of parole.
At the request of Mr. Washington, this Court convened an evidentiary hearing on June 24, 2004 with respect to his Petition for post-conviction relief. The petitioner presented only his own testimony is support of his Petition. The Court took the testimony without prejudice to the positions of the parties as to any of the legal issues that had been raised in connection with the Petition and without predetermining whether the testimony was in fact necessary or relevant to the issues raised in the Petition. Hearing Tr. 2.
Mr. Washington's testimony at the hearing centered on his claims of ineffective assistance by his counsel, Mr. Casparian, at trial. He repeatedly testified at the hearing that from day one, he wanted to testify at trial so he could tell the family what happened and to give them comfort. Mr. Washington claims he told Mr. Casparian and his assistant that he wanted to testify and Mr. Casparian, with his assistant present, repeatedly would tell him that he would not be testifying. Hearing Tr. 3-4, 18, 54-55. Mr. Washington further stated that had he been allowed to testify, as Mr. Casparian was aware, he would have spoken of his history of blackouts and his inability to remember what happened the night of the crime. Hearing Tr. 3-4, 13-14, 18, 54-55, 65. He faulted counsel for not calling Mrs. Washington to the stand, as she had told counsel of her husband's blackouts; for not examining the excrement in the bucket that would have evidenced his intoxication from drugs and alcohol; for not pursuing the blood sample taken from him that could have proven intoxication; for not consulting a psychiatrist or hypnotist to corroborate his blackouts; and for not asking him about his signed confession, which he claims he signed, not based on his memory of the events, but based on what the police told him he did. Hearing Tr. 13-14, 17-19, 21, 25-26, 28-30, 45-46, 56, 65-66.
Mr. Washington testified at the hearing that Mr. Casparian would not allow him to take the stand out of fear that the defendant would be truthful, to his detriment, but that Mr. Casparian consented to the defendant testifying just before trial and, therefore, mentioned in his opening statement to the jury that Mr. Washington would be taking the stand. Hearing Tr. 4-5, 10. Petitioner also testified that he agreed to rest at the close of the State's case-in-chief, after only a minute and a half conversation with his counsel, with the understanding that he would get to testify in what Mr. Casparian referred to as the "second trial." Hearing Tr. 8, 10, 36. Therefore, Mr. Washington stated that he never knowingly, intelligently or voluntarily waived his right to testify. Hearing Tr. 5.
In response to the concern of this Court regarding the late filing of this petition (which the Court had asked the parties to research and brief), Mr. Washington said that he did not wait until 1998 to raise his concerns (regarding trial counsel's failure to present his wife or others in his defense, to have forensic testing done and to guarantee his right to testify), but in fact sent letters to Mr. Casparian and Ms. Hurst in the Public Defender's Office in 1993, inquiring about these matters. Hearing Tr. 11-12, 35. He claims that he received a letter in return indicating that no response or assistance could be given because he was claiming ineffective assistance of counsel.[14] Hearing Tr. 12.
Mr. Washington also testified that he never had sexual intercourse with Alice Carcieri. Hearing Tr. 56. Yet, he also said that had he testified, he would have asked for the death penalty. Hearing Tr. 9,44, 55. He said that he told the police in his confession and the Vicarios in the letters that he did rape her but only because that was what the police told him. Hearing Tr. 56. He only could repeat the story as told to him because of the drugs and alcohol in his system at the time of the crime. He said he was good and stoned at that time, having had cases of beer in the days prior thereto. Hearing Tr. 20. When asked about telling the police that he felt bad for doing what he did, that he loved Alice Carcieri and that he tried to do something good for her, Mr. Washington did not directly answer the question of whether he made that statement to the police based on his memory or because that is what they asked him to say. He testified that he still feels sorry. He feels sorry for the fact that if he didn't do it, who did it. He said he did his job by admitting his guilt and asking for the death penalty; now the State should do its job by bringing in the evidence to show he's telling the truth. Hearing Tr. 58-59.
At the hearing, the petitioner introduced no evidence from his wife or others corroborative of a history of blackouts or a blackout on the night in question, no evidence that the bucket contents had been tested or could have been tested to support or establish diminished capacity at the time of the crime, no evidence corroborating that blood samples had been taken from him near the time of the crime that were analyzed or could have been analyzed in connection with such a defense or that any other forensic evidence or testing exists or could have been done to support such a defense. He presented no evidence of his letters to the Public Defender's Office and no testimony from Mr. Casparian's "assistant" about his discussions with counsel about testifying. He presented no evidence to substantiate his claims that the jury was all-white, that the prosecutor's brother worked with one of the jurors and that the jury, therefore, was biased. Hearing Tr. 46, 51.
Mr. Washington further testified that his blood, hair, urine and saliva were taken at the Intake Center at the Adult Correctional Institutions to determine if they matched the crime scene, that he saw a DNA report from the court file indicating that his DNA did not match the crime scene, and that he sent the report to prior counsel who never returned it. Hearing Tr. 25-26. Yet, there is no claim in his petition for post-conviction relief regarding this issue and no evidence to support his claims. Indeed, the reports in the pre-trial record of this case in the court file and those documents introduced at trial do not even concern his blood or DNA.
 STANDARD OF REVIEW
Under the Rhode Island Post-Conviction Relief Act, a person who has been convicted of, or sentenced for, a crime, who claims that the "conviction or sentence was in violation of the constitution of the United States or the constitution or laws of this state," may institute an action for post-conviction relief. R.I. Gen. Laws § 10-9.1-1(a)(1). The petitioner bears the burden to prove by a preponderance of the evidence that a violation has occurred. Palmigiano v. Mullen,377 A.2d 242, 248 (R.I. 1977). Also, a claim of error, which is not raised when available and during the appropriate phases of the process (pre-trial, trial, or on appeal), is barred from review under the Post-Conviction Relief Act. R.I. Gen. Laws § 10-9.1-8; State v. Carvalho, 450 A.2d 1102
(R.I. 1982) (held that available claims, other than ineffective assistance of counsel claims, not raised on direct appeal could not be raised in post-conviction proceeding); Cronan ex rel., 774 A.2d 866,877-878 (R.I. 2001); R.I. Super. Ct. R. Crim. P. 12(b)(2).[15] The Rhode Island Supreme Court has held that the appropriate avenue for raising a claimed violation of the Sixth Amendment by ineffective assistance of counsel is not by direct appeal, but rather through this post-conviction relief statute. State v. Freitas, 399 A.2d 1217, 1219
(R.I. 1979) ; State v. Gibbons, 418 A.2d 830, 839 (R.I. 1980).
In reviewing a claim of ineffective assistance of counsel, the Rhode Island Supreme Court has stated that the core issue is "whether `counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" Bustamante v. Wall, 866 A.2d 516, 522 (R.I. 2005) (citing Toole v. State, 748 A.2d 806, 809 (R.I. 2000), quoting Tarvis v.Moran, 551 A.2d 699, 700 (R.I. 1988)). In evaluating claims of ineffective assistance of counsel, the Court follows the standard enumerated in the seminal United States Supreme Court decision ofStrickland v. Washington, 466 U.S. 668 (1984). Bustamante,866 A.2d at 522.
The two-pronged Strickland test requires the defendant to prove first that "counsel's performance was deficient, to the point that the errors were so serious that trial counsel did not function at the level guaranteed by the Sixth Amendment." Brennan v. Vose, 764 A.2d 168, 171
(R.I. 2001) (citing Strickland, 466 U.S. at 687). If the defendant successfully meets the first prong of the test, the defendant then must prove that prejudice resulted from the error. Strickland at 687. The defendant must show "that such deficient performance was so prejudicial to the defense and the errors were so serious as to amount to a deprivation of the applicant's right to a fair trial." Bustamante at 522.
In applying the first prong of the test, the performance of counsel is evaluated by determining whether the performance "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. The Rhode Island Supreme Court has clarified this standard by stating that "mere tactical decisions, though ill-advised, do not by themselves constitute ineffective assistance of counsel." Bustamante, 866 A.2d at 523 (quotingToole, 748 A.2d at 809); State v. D'Alo, 477 A.2d 89, 92 (R.I. 1984) (quoting United States v. Bosch, 584 F.2d 1113, 1121 (1st Cir. 1978)). Mere evidence of a mistake on the part of counsel is insufficient to meet the performance prong of the test. The defendant must show not only that counsel made a mistake, but that the mistake was an objectively unreasonable one given the circumstances.
If a defendant is able to establish the first prong of the Strickland
test by demonstrating that counsel's performance was objectively unreasonable, the defendant then must establish that the failed performance resulted in serious prejudice to the defendant. Specifically,Strickland requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome."Strickland, 466 U.S. at 694. The standard focuses on the reliability of the outcome. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding . . . not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." Id. at 693. The United States Supreme Court has set the level of the defendant's burden of proof for showing that the error resulted in an unreliable outcome at a level less than a preponderance of the evidence. Id. at 694.
 ANALYSIS
This decision first will address Mr. Washington's claim that his counsel failed to present a defense of diminished capacity at trial or evidence of his intoxication for the purposes of mitigation. Next, this decision will address the defendant's claims that revolve around the fact that Mr. Washington did not testify in his own defense at trial. Mr. Washington asserts that his failure to testify amounts to ineffective assistance of counsel because his counsel broke a promise to the jury that he would testify that resulted in prejudice and because his counsel violated his constitutional right to testify. He also claims judicial error in not securing a waiver of his right to testify. Although these claims are overlapping and involve many of the same facts, the legal analysis is distinctly different. Each claim, therefore, will be addressed independently. Finally, this Court will address Mr. Washington's claims of other trial error and his contention that the State failed to disclose relevant evidence during discovery pertinent to his diminished capacity claim.
 DIMINISHED CAPACITY
Mr. Washington's two principal claims of ineffective assistance of counsel revolve around his counsel's alleged failure to present at trial a defense of diminished capacity to the charge of felony murder and the lesser included charge of rape or to present evidence of diminished capacity at sentencing for mitigation purposes. Each of these claims will be addressed independently.
 Trial
To prove ineffective assistance of counsel from a failure to present a defense of diminished capacity at trial, Mr. Washington first must satisfy the competency prong of the Strickland test by showing that it was objectively unreasonable for Mr. Casparian not to present the defense at trial. Mr. Washington claims that his counsel was incompetent in failing to pursue and present evidence at trial that would have supported a defense of diminished capacity and allowed for the jury to consider a lesser charge of manslaughter.
Specifically, Mr. Washington asserts that defense counsel failed to pursue the results of tests conducted by the F.B.I on (1) the contents of the bucket seized from the victim's home, into which, according to evidence admitted at trial, he had urinated and defecated; and (2) Mr. Washington's blood. He claims those tests would have revealed the level of his intoxication at the time he committed the crime, thereby supporting a defense of diminished capacity by voluntary intoxication. In addition, Mr. Washington claims that his counsel was ineffective in not allowing him to present testimony of his blackouts and his allegedly incomplete memories of the event and in failing to present expert and lay testimony regarding the blackouts and memory lapses. He now contends that his confession was not the product of his own memory but simply repeated what the police officers told him he did and that he simply perpetuated their story, and not his own, when he wrote letters to the victim's family.
In response to these arguments, the State maintains that it was objectively reasonable for defense counsel to refrain from presenting a defense of diminished capacity, traditionally asserted to negate evidence of a defendant's specific intent to commit a crime, because neither the charge of felony murder nor the lesser included offense of rape on which such charge was premised requires proof of a defendant's specific intent. During the evidentiary hearing before this Court on the petition for post-conviction relief, the State asserted that diminished capacity is a "moot point" in a felony murder conviction. Hearing Tr. 76. The State argued that all that is required to prove a charge of felony murder is that the defendant committed the underlying felony and that death resulted from that felony. No proof of specific intent to murder or to commit the underlying felony is required. The State asserts, therefore, that a defense of diminished capacity would be irrelevant to challenge a charge of felony murder or the lesser included charge of rape. Hearing Tr. 72-73, 76. The State further contends that regardless of the appropriateness of the defense, the proposed evidence and testimony would not have supported a defense of diminished capacity because the physical evidence that Mr. Washington claims his counsel failed to pursue could not have revealed the defendant's level of intoxication at the time of the crime and, furthermore, the defendant's actions before, during, and after the crime reveal a sane design. See State v. Amazeen,536 A.2d 1268, 1272 (R.I. 1987) (instruction to the jury of manslaughter by reason of diminished capacity only permitted if evidence would support a reasonable finding that intoxication so paralyzed defendant's will that it removed from him the capacity to form any sane design).
This Court finds that it was objectively reasonable for Mr. Washington's defense counsel to forego a defense of diminished capacity at trial given its uselessness in defending against charges of felony murder based on rape and the lesser included charge of rape. Diminished capacity is only permitted as a defense to a crime of specific intent.State v. Glynn, 658 A.2d 6, 7 (R.I. 1995); Amazeen at 1271; State v.Doyon, 416 A.2d 130, 137 (R.I. 1980); State v. Amaral, 279 A.2d 428, 429
(R.I. 1971). Although the crime of murder is a crime of specific intent, Mr. Washington was tried not simply for murder, but for felony murder. A charge of felony murder is predicated on proof of the underlying felony that intentionally or unintentionally results in a death. State v.Washington, 581 A.2d at 1034. Hence, the State, in proving a charge of felony murder, is not required to prove that the defendant intended tomurder the victim. Id. As the Rhode Island Supreme Court found in its decision denying Mr. Washington's appeal, a "sentence [of life without parole] may be imposed [following a conviction for felony murder based on rape] even when the resulting death is unintentional and the underlying felony was not intended as torture." Id. The Supreme Court affirmed that felony murder is classified as first degree murder "simply because the legislature has said so." Id. (quoting State v. Villani, 491 A.2d 976,980 (R.I. 1985)). All that was necessary to prove felony murder in the instant case, therefore, was evidence to establish beyond a reasonable doubt that Mr. Washington raped Ms. Carcieri and that the rape was the proximate cause of Ms. Carcieri's death. Id.; see also R.I. Gen. Laws §11-23-1 (enumerating rape as one of the underlying felonies necessary to establish felony murder). Presenting a defense of diminished capacity (which is only proper to defend against a crime of specific intent) to the underlying felony of rape on which the felony murder charge depended, or to the lesser-included offense of rape itself, would have been futile because rape is a crime of general intent. See R.I. Gen. Laws § 11-37-2 (defining the elements of first-degree sexual assault); seealso Washington at 1035 (suggesting that proof of intent for the underlying felony is not necessary for establishing a charge of felony murder); Trial Tr. 265 (statement of defense counsel characterizing rape as general intent crime).
For the defendant now to suggest in his petition for post-conviction relief that his counsel should have asserted a defense of diminished capacity so as to secure the possibility of a conviction of a lesser included charge of manslaughter thus represents a fundamental misconception of law. Defendant fails to appreciate the legal distinction between murder and felony murder based on rape with respect to a defense of diminished capacity. While it is true that proof of diminished capacity due to voluntary intoxication asserted as a defense to a charge of murder (other than felony murder) can warrant an instruction and conviction for the lesser-included offense of manslaughter, it is not true of felony murder. Murder that is not based on a death resulting from a felony depends on proof of a specific intent to kill that can be negated by evidence of diminished capacity, whereas felony murder (in this case based on the underlying felony of rape) requires no proof of specific intent to kill or rape that could be so negated. Mr. Washington's counsel, therefore, hardly can be faulted for not asserting at trial a defense of diminished capacity to felony murder based on rape that has no basis in law.
Indeed, it could be argued that it would have been objectively unreasonable for counsel to have presented a defense of diminished capacity to charged crimes to which the defense is inapplicable. Attempting to mount such a defense and having the Court exclude such evidence on legal grounds or presenting evidence of diminished capacity and having the Court instruct the jury that the State need not prove intent to kill or rape to prove felony murder or that intoxication is not a defense to the charges — especially in light of the evidence of Mr. Washington's confession and letters to the victim's family — could have undermined his defenses of lack of causation and remorse and prejudiced his case in the eyes of the jury. See Amazeen at 1272 (jury only will be allowed to consider lesser charge if the evidence reasonably supports the defense of diminished capacity). For these reasons alone, Mr. Washington has failed to satisfy the first prong of the Strickland test and so, too, fails to establish his claim of ineffective assistance of counsel for failure to present a defense of diminished capacity at trial to the charge of felony murder and the lesser-included offense of rape.
Moreover, even assuming that defense counsel could have raised diminished capacity as a defense at trial or presented evidence of the defendant's voluntary intoxication so as to negate a specific intent to rape or to do so under aggravated circumstances, the trial record supports the conclusion that Mr. Casparian considered raising the defense at trial and chose not to, with the consent of the defendant, based on the state of the evidence in the trial and pre-trial record of the case. Defense counsel's tactical decision in that regard was not only objectively reasonable, but wise.
At the time of trial, Mr. Casparian would have been aware of the defendant's statements in his confession that he had gotten high most of the night before the rape, that he had smoked crack in the basement, and that he had gone to the bathroom in a bucket in the basement. He would have been aware of Mr. Washington's statements to Dr. Stewart while at the Adult Correctional Institutions that he had smoked crack and was drinking in the cellar.
Yet, he also knew that defendant had given a signed confession to the police that he indicated was given freely and voluntarily and not while under the influence of drugs or alcohol. In the confession, Mr. Washington admitted to doing drugs before the crime but also described in detail the nature of his preparation for, consummation of and flight from the rape. He described his remorse and the fact that he was sorry and did not mean to hurt her. There is no evidence in the confession of lack of memory or a blackout.
He knew further that Mr. Washington wrote letters to Mr. and Mrs. Vicario, in the months after the rape and confession, describing the details of the crime, his feelings about the crime and his love for Alice Carcieri and how he had told the police everything in his confession. In the second letter, he memorialized a statement attributed to his counsel telling him that he did the right thing by telling the police everything that he had done. He promised the victim's family that he would tell the truth at trial. There is nothing in either of the letters suggesting a lack of memory or a blackout or that his confession to the police was their story and not his.
Mr. Casparian also would have known from the trial record that the State had overwhelming physical evidence corroborating the defendant's confession (including fingerprint identification evidence, evidence of sperm on the bedding and victim's clothing, hair fibers consistent with defendant's hair, and evidence of his access to and presence in the basement where the rope was obtained). He would have known as well that although the defendant had made statements about drinking and doing drugs, that none of his statements quantified the amounts or precise nature of those substances.
There were no reports indicating that the defendant ever had his blood drawn or urine tested after the fact while in custody in New York or Rhode Island that could have assisted in that regard. Mr. Casparian would have known that even if such tests were done, they would not have yielded evidence of the defendant's level of intoxication at or near the time of the crime because the custody occurred many days later. In addition, there was nothing in the FBI report regarding the bucket that indicated that its contents had been preserved or that they could be or were tested for the presence of drugs or alcohol. The report simply indicated that the FBI does not conduct any examinations regarding the conclusive identification of fecal material.
Finally, Mr. Casparian would have known that the State had retained an expert psychiatrist, Dr. Lester Grinspoon, an Associate Professor of Psychiatry at Harvard Medical School, to negate any attempt by the defense to present evidence of diminished capacity. Dr. Grinspoon interviewed Mr. Washington and was prepared to testify that he was not suffering from cocaine addiction at the time of the crime nor was his level of intoxication sufficient to negate a specific intent to commit torture or aggravated battery on the victim.
Assembling all of this evidence, it certainly would have been objectively reasonable for Mr. Casparian to decide not to assert at trial a defense of diminished capacity (to the extent it could be found to exist) or introduce evidence of voluntary intoxication on the part of Mr. Washington. While the evidence may have suggested drinking and drug use by the defendant before and at the time of the crime, it did not credibly suggest any evidence of a blackout at the time of the offense or intoxication of such a level as to negate any specific intent. Indeed, Mr. Washington's voluntary confession to the police and letters to the victim's family — replete with statements indicating the defendant's detailed memory of his rape of Ms. Carcieri, his preparation for the crime, his efforts to conceal the crime after the fact and his feelings of remorse — suggest the opposite.
That is why Mr. Washington's post-conviction hearing testimony as to a history of blackouts and his statement that he suffered a blackout and lack of any memory as to the crime, given years after the evidence was collected, trial was had and his counsel died cannot be afforded any weight. He never even mentioned a blackout in the trial record until, after the trial and his conviction, he gave an unsworn statement in the presentence report. His hearing testimony is inconsistent with his prior statements in his confession and his letters to the Vicarios and his statement to Dr. Stewart. It is not corroborated by any of the physical evidence introduced at trial nor does it appear that testing the bucket or Mr. Washington's blood taken days after the crime could assist in determining his level of intoxication at the time of the rape. His testimony about blackouts likewise is not corroborated by the testimony of any lay witnesses (including his wife) or expert witnesses.
While Mr. Washington testified at the hearing that Mr. Casparian knew all about his blackouts and his lack of memory about the crime, he conveniently waited until after his counsel died to make that charge.[16]
The charge seems difficult to believe given Mr. Casparian's adamant statement at trial that, as his client knows, this is not a diminished capacity case.
To have attempted to present a diminished capacity defense, even if permissible, under these circumstances would not have been successful as a matter of law. Such a defense only may be considered by a jury if the evidence would support a reasonable finding that intoxication so paralyzed the defendant's will that it removed from him the capacity to form a sane design. Amazeen, 536 A.2d at 1272. The record evidence simply does not reach that level of proof.
Introducing evidence of intoxication under such circumstances would have carried the risk of never getting to the jury on the issue. Even if allowed, the evidence carried the even greater risk of undermining the defense of remorse so forcefully asserted by Mr. Casparian. Rather than Mr. Washington being portrayed as a man who accepted responsibility for his crime by confessing to it, who loved his victim, and who did not mean to hurt her, he would have been portrayed as a man trying to run from his confessions, who blamed not himself but drugs and alcohol for his crimes. Such an approach could have angered the jury and increased the risk of a conviction and finding of aggravating circumstances, allowing for a sentence of life without parole.
Mr. Casparian's decision not to assert this defense, therefore, was objectively reasonable. Even if the decision is viewed by the defendant as ill-advised after the fact, it was a tactical decision not only well within the bounds of propriety, but eminently reasonable. It was a decision that Mr. Casparian made affirmatively and with the knowledge and consent of Mr. Washington, as evidenced by counsel's statements at sentencing. Trial Tr. 385. Based on the trial record, therefore, Mr. Washington has failed to establish a breach by counsel of the performance prong of Strickland arising out of his decision not to mount a diminished capacity defense at trial. Moreover, even if counsel could have or should have presented such a defense, for the reasons stated, making a claim of blackout at the time of a crime to which you have confessed would not have resulted in a different outcome and could well have eviscerated the defense that the defendant did advance at trial.
 Sentencing
Mr. Washington also makes a claim of ineffective assistance of counsel for Mr. Casparian's alleged failure to present evidence regarding his claimed blackouts and use of drugs and alcohol, at the time of the commission of the crime, to be considered by the Court for the purposes of mitigation at sentencing. Mr. Washington essentially claims that his counsel was incompetent in failing to present this evidence to the Court and that had the Court heard the evidence, it is likely it would have been persuaded to impose a sentence of life with the possibility of parole, as opposed to the sentence of life without the possibility of parole that was imposed. Specifically, Mr. Washington claims that his counsel, "stated mitigation evidence as only his remorse. This is where defense counsel's broken promise to the jury and the evidence that would have arisen from defendant's testimony would have had significant weight." Application, Section A.2.
However, Mr. Washington has not provided this Court with any evidence to indicate that his testimony would have provided the trial justice with new information that was not considered by the Court at the time of sentencing. At the hearing before this Court on the motion for post-conviction relief, Mr. Washington seemed to suggest that, had he been allowed to testify, he would have provided the Court with information regarding his claimed blackouts and his level of intoxication at the time of the crime. Hearing Tr. 3-4, 13-14, 18, 54-55, 65. Yet, the trial record suggests that Mr. Washington would not have testified that he had a memory lapse regarding the crime and that drugs and alcohol had affected his actions. According to the trial record, Mr. Washington never contended that he did not recall committing the rape, due to voluntary intoxication, until his meeting with the probation officer who compiled a pre-sentence report. Trial Tr. 392.
Furthermore, during his allocution at sentencing, Mr. Washington contradicted the statements he made to the probation officer. His statements at sentencing only consisted of expressions of his remorse for his actions and claims that he would not do it again. Trial Tr. 404. With the exception of the statement to the probation officer, throughout every stage of the process, Mr. Washington freely admitted to his having committed the sexual assault and never asserted otherwise. In fact, he expressly turned down the option of presenting any kind of defense of diminished capacity, as evidenced by the sentencing portion of the transcript. At that stage, defense counsel states, "I think it was clear on the record that this was not a diminished capacity case. That has been discussed with Jeffrey, discussed again today." Trial Tr. 385. Even during his appearance before this Court, upon cross-examination, Mr. Washington contradicted his claim that he would have presented testimony of blackouts and intoxication. Hearing Tr. 54-56. When asked by the State what he would have testified to, he replies, "what happened . . . sorrow . . . what he feels in his head." Id. It is not at all clear to this Court, therefore, that the defendant would have talked about his blackouts and lack of memory of the crime at sentencing even if counsel had offered him the chance. If he had, he would have violated his promise to the victim's family that was so important to him.
Even assuming that the defendant would have presented testimony claiming a blackout and severe intoxication at the time he committed the crime, the testimony would not have presented any evidence that was not already taken into consideration by the Court in imposing the sentence. The Court was clearly aware of the issues surrounding a potential claim of diminished capacity, based on claimed blackouts, despite the lack of such presentation by defense counsel. Trial Tr. 410-413. The trial justice was aware of the statement the defendant made to the probation officer, which raises the issue of blackouts and defendant's assertion that he could not have committed the assault because he was too intoxicated. Trial Tr. 412. The Court, however, was not in the least bit persuaded by any contention of diminished capacity as a mitigating factor. Trial Tr. 411, 413. In fact, it appears that the Court was much more persuaded by the defendant's two voluntary statements made shortly after the incident in which he "vividly and clearly describes" his rape of Ms. Carcieri. Justice Caldarone further stated, "The scenario of inconsistency hardly provides the Court any basis of consideration of any mitigating factors with respect to that contention." Trial Tr. 413. These statements by the trial justice render it reasonable to infer that he would not have been persuaded in the least by any evidence the defense may have presented regarding blackouts or level of intoxication. The Rhode Island Supreme Court saw it the same way on appeal when it found no mitigating circumstances. The Court simply found the claims to be incredible and in direct contradiction to the very credible statements made by the defendant to the police, the victim's family, and to the Court during allocution.
In conclusion, Mr. Washington has not presented evidence to this Court that supports the contention that his testimony would have offered new information for consideration in sentencing. Therefore, this Court cannot and will not disturb the judgment of the trial justice in determining the sentence of life without the possibility of parole.
 PROMISE TO THE JURY
Mr. Washington also asserts an ineffective assistance of counsel claim based on his counsel's alleged failure to keep a promise to the jury that Mr. Washington would testify. To successfully establish an ineffective assistance of counsel claim based on a broken promise to the jury, Mr. Washington must meet the two prongs of the Strickland test. To meet both prongs of the test, he must establish that his counsel broke his promise to the jury, that the broken promise was an objectively unreasonable decision by counsel, and that the decision likely affected the outcome of the proceedings. Ouber v. Guarino, 293 F.3d 19, 25 (1st Cir. 2002).
The performance prong of the Strickland test requires the defendant to prove that the alleged error by counsel was an objectively unreasonable one. Strickland, 466 U.S. at 688. The First Circuit held in Ouber that making a promise to a jury that the defendant will testify and then failing to keep the promise constitutes an objectively unreasonable decision by counsel. 293 F.2d at 27.
In Ouber, the First Circuit concluded that there could be no reasoned tactical decision behind making a promise to the jury that the defendant would testify and then advising the defendant against testifying. The Court reasoned that the two decisions taken together only could be viewed as an objectively unreasonable mistake because the impact of such decisions would be to create prejudice with the jury. Id. at 27, 28. The Court in Ouber, however, did reserve an exception for the possibility of unforeseeable events. The Court acknowledged that events might occur that would warrant a change in strategy and a reasonable decision not to call the defendant to the stand. Id. at 29. Yet, the Court concluded that if an event that would warrant a decision not to have the defendant testify is foreseeable, then the objectively reasonable decision would be not to promise such testimony in the opening statement. Id. at 29, 30. Due to the possible impact on the jury of breaking such a promise, the Court reasoned that the responsible and prudent decision would be to refrain from making the promise in the opening statement. Id. The Court concluded that to make such a promise and break it, when the possibility of breaking it is foreseeable, is not a reasonable trial strategy and only can be considered a serious error by counsel. Id.
The Court in Ouber found that the defense counsel in that case had made such an error. In that case, the defendant was facing her third trial on cocaine trafficking charges for allegedly completing a sale of cocaine to an undercover narcotics officer. The first two trials, in each of which the defendant testified in her own defense, had resulted in hung juries. During the opening statement of the third trial, defense counsel made the testimony of the defendant the centerpiece of the defense, calling on the jury to evaluate the credibility of her testimony against that of the undercover officer and others. Yet, inexplicably, the defense counsel never called the defendant to the stand to testify as to her version of events. The Court found that any possible rationale for counsel's decision not to have the defendant testify was foreseeable at the time the promise to the jury was made. The decision, therefore, to make the promise in the first place and then to fail to keep it was an unreasonable error, thus meeting the first prong of the Strickland test. Id. at 29-32.
The Court in Ouber freely admitted that the task of determining whether counsel's error impacted the outcome of the proceedings is a difficult one. Ouber, 293 F.3d at 33. That task, however, was a little less difficult in that case due to the existence of two previous trials against which the Court could compare the trial in question. Id. The major difference between the first two Ouber trials (which were hung juries) and the third trial (which resulted in a conviction) was the absence of the defendant's testimony in the third trial. In finding that the error prejudiced the outcome of the proceedings, the Court in Ouber
focused on the impact the promise had on the jury by engendering expectations that counsel never fulfilled. Id. at 34-35. Specifically, defense counsel had directly placed at issue the credibility of the testimony of an undercover officer as compared to that of the defendant.Id. The result of failing to keep the promise that the defendant would testify was that the jury only heard the police officer's account of the alleged crime, when the defendant's account would have been materially different. Id. at 34. Defense counsel had centered the entire defense on the difference between the accounts but then failed to provide the promised conflicting account: the defendant's version of events. In addition, counsel failed to provide any other evidence or testimony that may have effectively fulfilled the expectations of the jury that the promise had engendered. Id. at 29. Ouber was a very close case that had resulted in two hung juries and even had the third jury deadlocked for a period of time. The Court in Ouber reasoned that in such a close case, an error such as a broken promise to the jury likely impacted the outcome of the proceedings. Id. at 33-34.
At first glance, the Court in Ouber appears to have drawn a bright line rule in establishing that making a promise to the jury that the defendant will testify when it is foreseeable that the defendant may not testify amounts to incompetence per se, thereby satisfying the first prong of theStrickland test. The Court established this rule, however, out of concern with the prejudice engendered against a defendant when the defendant's testimony is promised and not provided. Yet, prejudice is not necessarily created in deciding to advise a defendant against testifying. If the expectations engendered by the promise to the jury can be and are fulfilled through other means, then the promise has not been broken and the prejudice that concerned the Court in Ouber has not been created. Certainly, the Court in Ouber would not require defense counsel to call a defendant to testify if the testimony would hurt the defendant and is unnecessary because the expectations engendered by the promise have been fulfilled by other means. If no prejudice has been created due to the fulfillment of the promise, then defense counsel is not required to present potentially damaging testimony by the defendant.
Mr. Washington's trial is similar to Ms. Ouber's in that defense counsel did place the defendant's testimony at issue during the opening statement. Counsel told the jury that Mr. Washington would "take the stand and he is going to tell you how he feels sorry for what he did." Trial Tr. 15. Defense counsel also promised the jury that Mr. Washington would tell them his state of mind on the day of the crime, the following day, and when he was taken into custody by the police in New York. Trial Tr. 15. Furthermore, Mr. Washington's state of mind did appear to be a central aspect of the defense, which involved a challenge to the application of the felony murder statute by arguing that the State was required to prove malice aforethought. Trial Tr. 263-272. In promulgating this aspect of the defense strategy, defense counsel put Mr. Washington's state of mind at issue by attempting to establish Mr. Washington's remorse and lack of malice. Trial Tr. 282-284.
The instant case, however, can be distinguished from the Ouber case in at least one major aspect: defense counsel did present evidence and argument that arguably fulfilled the expectations of the jury engendered by the promise. Defense counsel did not object to the reading in full by one of the arresting officers of the confession made by Mr. Washington to the Providence police. Trial Tr. 98-102. The confession reflects Mr. Washington's remorse and state of mind. He told the detectives, "I really felt bad for her. I loved her, and I thought I was doing something good for her because I was feeling so bad for her. I'm sorry what happened. I didn't mean to hurt her." Trial Tr. 101. He also stated that he "felt so guilty." Trial Tr. 100. During cross-examination of one of the detectives, defense counsel also demonstrated Mr. Washington's remorse by having the detective establish how Mr. Washington had essentially turned himself into the Providence police by telling the New York police about his actions in Rhode Island. Trial Tr. 106-107. Defense counsel also established through cross-examination of the detective that Mr. Washington cooperated fully with police and expressed remorse while confessing to the crime. Trial Tr. 110-111. In addition, defense counsel did not object to the introduction into evidence of letters written by Mr. Washington to the family of Ms. Carcieri in which the defendant recounts the events leading up to, during, and after the commission of the rape. As Mr. Washington describes the events, he tells the family what he was thinking and feeling and how his actions were motivated out of love for Ms. Carcieri. At the beginning and end of the letters he expresses to the family his deep remorse for having hurt Ms. Carcieri and the family. Trial Tr. 173; Exhibit 3.
During closing arguments, defense counsel focused on these pieces of evidence and the testimony of the detective as establishing the defendant's state of mind and deep remorse. Trial Tr. 282-284. Mr. Casparian told the jury, "[i]f you want to focus on state of mind. I am going to take the liberty of reading the letters that [the defendant] wrote to the survivors of Alice Carcieri." Trial Tr. 285. He then proceeded to read in full to the jury the letters that Mr. Washington wrote to Vinnie and Elda Vicario in January and February 1988. Trial Tr. 285. The testimony elicited by defense counsel, the evidence admitted at trial and counsel's arguments thus establish the defendant's remorse and state of mind, as was promised to the jury.
Moreover, unlike in Ouber, defense counsel in the instant case explained to the jury during closing arguments why Mr. Washington did not take the stand, as was promised during opening arguments. Defense counsel told the jury, "During my opening statement, I suggested to you that Jeffrey Washington would testify and tell you his state of mind, and you are probably wondering why he did not. . . . he didn't take the stand because he has already testified in this case. . . ." Trial Tr. 281-282. At this point, Mr. Casparian highlighted key portions of the defendant's confession and letters to the family to the jury. Trial Tr. 282-288. He then reiterated, "The point is, he has testified." Trial Tr. 288. He also intimated that the defendant's choice was based on advice of counsel. Hence, unlike the facts in Ouber, in this case, the expectations engendered by the promise made by defense counsel during opening argument were actually fulfilled by the evidence adduced in the State's case, defense counsel's cross-examination of the State's witnesses and his closing argument. Essentially, the promise was never broken and thus prejudice never occurred.
In addition, this case can be distinguished from Ouber on other grounds. In Ouber, counsel promised the jury that the defendant would testify and then changed his mind based on evidence presented at trial. He then advised his client not to take the stand, she did not take the stand upon advice of counsel and the jury convicted her. The Court found that the change in counsel's advice as to whether the defendant would take the stand and her reliance on the advice were foreseeable such that the promise should not have been made.
In contrast, however, this case is not about counsel changing his mind about putting the defendant on the witness stand and the foreseeability of such a change in counsel's position. Here, defense counsel never wavered in his decision to advise Mr. Washington not to take the stand but, contrary to counsel's advice, the defendant insisted on testifying in order to fulfill his promise to the family to tell them the truth about what had happened to Alice Carcieri. The petitioner's testimony at the post-conviction hearing confirms this view. Mr. Casparian thus opened the case with the full expectation that, contrary to his advice, the defendant would take the stand in his own defense. He made his promise to the jury accordingly.
At the same time, Mr. Casparian fervently believed that, if Mr. Washington took the witness stand, he would tell the truth as he had told it in his confession and his letters to the family and that such testimony and any cross-examination expanding upon it could be fatal to the defendant's case. Hearing Tr. 10-11. He thus continued to counsel the defendant accordingly and adopted a trial strategy to try to protect his client's interests to the extent possible while still hoping that he could convince him not to testify. It was only after the testimony that the defendant had promised the family (and that his counsel had promised the jury) was into evidence (in the form of his confession and letters to the family) and the defendant understood that he still would have the opportunity to address the family later (at a "second trial" which this Court interprets to mean at sentencing), that Mr. Washington acquiesced to counsel's advice to rest and not take the stand. As Mr. Casparian's advice to his client not to testify never changed, as his promise to the jury was based not on that advice but on the decision of his client to reject that advice, and as the evidence does not suggest that counsel could reasonably have expected or counted on a change of heart by the defendant about taking the stand, this Court cannot say that the change in circumstances that resulted in the defendant taking counsel's advice and not testifying should have been foreseeable to counsel and reason not to make the promise.[17]
Counsel cannot be required to put a client on the stand against his best interests just to fulfill a promise to the jury, just as counsel cannot be required to refrain from making a promise to the jury that his client will testify when that is his client's adamant demand, even though the decision may be against the advice of counsel and the client may later change his mind.
As such, Mr. Washington has failed to meet his burden to show that Mr. Casparian broke his promise to the jury or that the broken promise was foreseeable so as to make Mr. Casparian's representations in his opening statement objectively unreasonable within the meaning of Ouber.
Accordingly, Mr. Washington cannot establish the first prong of theStrickland test and thus fails to establish a claim of ineffective assistance of counsel by a broken promise to the jury. Moreover, even assuming that the first prong could be established, there is insufficient evidence of prejudice resulting from the promise and its alleged breaking to satisfy the second prong of Strickland. As noted previously, the promise, though made, was not broken. It was fulfilled through the introduction of the defendant's statements and counsel's explanation to the jury that the defendant did not take the stand because he had already testified. The Court's instructions to the jury that it could not penalize the defendant in any way for not taking the stand helped mitigate any residual harm that may have occurred as a result of the initial promise and the defendant's decision not to take the stand. In addition, even if the promise had been fulfilled through the defendant taking the stand, he has failed to demonstrate that his testimony likely would have made a difference in the outcome of his trial.[18] And if the promise had never been made, the jury would not have been more likely to acquit, find the defendant guilty of the lesser included offense of rape or find an absence of aggravating circumstances.
 RIGHT TO TESTIFY
Mr. Washington's final claim of ineffective assistance of counsel is based on the alleged violation of his constitutional right to testify. Mr. Washington asserts that his waiver of his right to testify was not knowing, intelligent and voluntary and, therefore, was invalid. He further claims that the violation of his right to testify by his defense counsel resulted in significant prejudice because it prevented the jury from hearing testimony from him that may have produced a different trial outcome.
The United States Supreme Court held in Rock v. Arkansas, 483 U.S. 44
(1987), that a defendant has an inferable right to testify in his or her own defense under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. U.S. v. Teague, 953 F.2d 1525, 1530 (11th Cir. 1992) (citing Rock). The Eleventh Circuit has stated further that for a defendant to prove that his right to testify was violated (resulting in ineffective assistance of counsel), he must present evidence that his counsel did not allow for a knowing, intelligent, and voluntary waiver of the right. Id. at 1533 (citing waiver standard established in Johnson v. Zerbst, 304 U.S. 458, 464 (1938)).
In Teague, the Eleventh Circuit held that the right to testify is fundamental and cannot be waived by anyone (even defense counsel) other than the defendant. Id. at 1531. The Court in Teague also established that the proper avenue for addressing a violation of a defendant's right to testify by defense counsel is through an ineffective assistance of counsel claim. Id. at 1535.
To successfully establish a claim of ineffective assistance of counsel for violation of the defendant's right to testify, the defendant must meet the elements of the Strickland test. The Court in Teague found that the failure of counsel to protect the defendant's right to testify would constitute objectively unreasonable conduct, thereby violating the competency prong of the Strickland test. Id. at 1534. To prove a claim that counsel did not protect the defendant's right to testify, the defendant must show that the "action or inaction of the attorney deprived the defendant of the ability to choose whether or not to testify on his own behalf." Id.
Essentially, counsel fails to protect the right to testify if defense counsel does not inform the defendant of the right to testify or refuses to let the defendant testify when the defendant attempts to assert the right. Id. First, counsel must inform the defendant of his constitutional right to testify. Once the defendant has been informed, defense counsel is required to advise the defendant vigorously as to whether it is sound trial strategy to testify. Id. at 1533. Only after having received such advice can a defendant knowingly and intelligently waive the right to testify. Id. (citing waiver standard established in Johnson v. Zerbst,304 U.S. 458, 464 (1938)). Although counsel must advise the defendant vigorously, counsel must not overbear the defendant's will to choose whether to testify on his or her behalf. Id. at 1535. If counsel does overbear the defendant's will, then the waiver of the right to testify is involuntary and void. Consequently, a defendant who was aware of his or her right to testify but is claiming the waiver of the right was involuntary, must present evidence that his or her will was overborne by defense counsel. Id.
In Teague, the defendant had asked his counsel repeatedly when he would have the opportunity to testify. In addition, there was evidence that after the State presented its last witness, the defendant pulled on his counsel's sleeve and again asked when he would have the chance to testify. Id. at 1528. However, there also was evidence that his counsel had advised the defendant of his right and advised him not to take the stand. There was no evidence before the Court in Teague that the defendant had insisted on testifying and insufficient evidence to show that his will had been overborne by his counsel. Id. at 1535. The Eleventh Circuit thus affirmed the lower court's decision denying the defendant's claim for ineffective assistance of counsel.
Similarly, the record in the instant case reflects a voluntary waiver by the defendant of his right to testify and no evidence, at the time of that voluntary waiver, that Mr. Washington had insisted on testifying after being advised by counsel not to take the stand or that his will had been overborne. There is no evidence on the record that the waiver was unknowing or unintelligent.
During the sentencing phase of the proceedings, defense counsel acknowledged that Mr. Washington had expressed to him a desire to testify to express his remorse. Mr. Casparian told the judge that Mr. Washington "wanted to take the stand during trial to tell you and the jury that he wanted to be put to death." Trial Tr. 400. However, counsel also stated, "circumstances turned out that we didn't present him to testify in front of the jury." Trial Tr. 400. As defense counsel died before Mr. Washington filed his petition for post-conviction relief, there is no evidence before this Court, beyond the word of Mr. Washington, to indicate the precise nature of those circumstances. The trial transcript, however, evidences that defense counsel asked the Court for an extended recess to discuss certain matters with Mr. Washington before resting the defense and further shows that they took at least thirty minutes to consult and converse together. Mr. Casparian, with the defendant by his side and without the jury present, then told the Court that he had "discussed certain matters with Mr. Washington" and that after "consulting with him" and "conversing together," the defense had decided to rest. Trial Tr. 272-273. Counsel directly asked Mr. Washington, on the record and before the Court, "Is that correct, Jeffrey?" to which the defendant replied, "Yes." Trial Tr. 272-73.
It reasonably can be inferred from this portion of the transcript that defense counsel advised Mr. Washington during the conversation against testifying in response to the State's case at trial and that Mr. Washington assented voluntarily. In the absence of anything in the record showing that the defendant at that time continued to insist on his right to testify, that his will was overborne or that he did not understand the choice he was making, he must be deemed, under Teague, to have failed to establish the absence of a knowing and intelligent waiver of his right to testify.
Yet Mr. Washington wants to go beyond the record. He asks this Court, based on his testimony at the post-conviction hearing, to believe that Mr. Casparian always told him that he would not be allowed to take the stand, no matter what, because he was going to be truthful. Hearing Tr. 4, 10-11. He wants to suggest that Mr. Casparian refused to let him testify. Of course, we know that is not true because indeed Mr. Casparian told the jury in opening statement, after counseling him not to take the stand and failing to convince the defendant that it was in his best interest not to testify, that Mr. Washington would take the stand. In addition, the notion that Mr. Casparian refused to let him testify is inconsistent with the petitioner's testimony that his counsel told him he could testify in the "second part" of the trial.
Mr. Washington next testified that he did not know at the time Mr. Casparian told the Court that the defense was going to rest that he was going to rest and that they had not even talked. Hearing Tr. 8. He later contradicted that testimony, however, when stating that they spoke in the cellblock and Mr. Casparian told him "we are going to rest. You are going to rest and you will get a chance to say a few words because this is the first part of the trial because we got to go to the second part of the trial." Hearing Tr. 8, 36. Mr. Washington at first said that conversation last thirty minutes and later said that Mr. Casparian only talked to him for one and one-half minutes before telling him they were going to rest.Id. Mr. Washington claims that he was under the impression, due to this conversation with defense counsel, that he would get another opportunity to testify and that is the only reason he waived his right to testify at that time. Hence, he claims his waiver was not knowing and intelligent because he was unaware that he was waiving his right to testify.
This argument of unintelligent and unknowing waiver is illogical to this Court. Mr. Washington did not testify as to what he understood the "second trial" to mean. If defendant thought that he would get to testify at the penalty phase, then that is nonsensical because if he were acquitted or convicted of the lesser charge of rape, there would be no penalty phase. If he understood the term to mean the sentencing hearing, as his current counsel suggests, then he got what he was promised because he spoke at sentencing. Nowhere in the record of the penalty phase or sentencing proceedings does he quarrel with counsel's decision not to present evidence nor does he seek to exercise a right to testify.
In determining this issue, it is not lost upon this Court that Mr. Washington claims he was aware of this potential claim of ineffective assistance of counsel based on violation of the right to testify since at least 1993, but chose to wait to file the claim until after trial counsel died. During his appearance before this Court, Mr. Washington testified that he had written letters in 1993 to Mr. Casparian and Ms. Hurst inquiring as to why he never was allowed to testify at trial. Hearing Tr. Pgs. 11-12. Those letters, however, are not in evidence and thus his claims in that regard cannot be corroborated. Regardless, Mr. Washington conveniently waited until 1998, one year after defense counsel died, to file this claim for post-conviction relief alleging denial of the right to testify. This Court is hesitant to give any weight to the defendant's claim of denial of a right to testify, especially in light of the inconsistencies in his own testimony and the absence of support for his testimony in the record, when it is apparent that he sat on his rights until a time when his claims could not be disputed by defense counsel.
Based on a review of Mr. Washington's testimony on this issue as well as the other issues raised in his post-conviction petition, this Court rejects the testimony of the defendant as to an unknowing and unintelligent waiver. This Court is of the view, based on its view of the record and the hearing testimony, that Mr. Casparian counseled the defendant vigorously at the outset of trial against taking the stand, that Mr. Washington rejected that advice and continued to insist on testifying at the outset of trial, that counsel then promised the jury that the defendant would testify in accordance with his client's wishes at the time, that Mr. Casparian continued to zealously represent his client at the close of the State's case by counseling him against taking the stand, that he was able to convince Mr. Washington that his statements as to the truth were already in evidence and all that were necessary for purposes of the jury, and that he would be able to speak to the victim's family (which the defendant had promised them and desired more than speaking to the jury) at sentencing. Based on this discussion with counsel, where he was not simply told what to do but where he and his attorney "discussed" and he was "consulted," Mr. Washington agreed voluntarily, intelligently and knowingly not to take the stand in his own defense but to rest, as he confirmed on the record. See Hearing Tr. 273. He spoke at sentencing, as discussed, and never sought to accuse counsel of denying him the right to testify until after counsel had died.
There is no credible evidence before the Court, therefore, to suggest that Mr. Washington insisted on testifying at the time he agreed to rest on the record, that his will to testify was overborne by counsel or that he still thought that he would be testifying at the time he rested. As inTeague, the petitioner has failed to prove the absence of a valid waiver of his right to testify. Trial Tr. 272-273, 400. Therefore, Mr. Washington cannot establish that his counsel's conduct was objectively unreasonable by failing to protect his right to testify.
Even assuming, arguendo, that the defendant's waiver was not valid and that the petitioner could satisfy the performance prong of theStrickland test, Mr. Washington still fails to present evidence that the absence of his testimony prejudiced him at trial. To satisfy the prejudice prong of the Strickland test, the defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." Strickland, 466 U.S. at 694.
The record does not disclose any evidence that had Mr. Washington been allowed to testify, he would have presented testimony that would have been beneficial to his defense. In fact, in his letter to the victim's family introduced at trial, Mr. Washington asserted that he wanted to testify because he wanted to tell the family how sorry he was for what he had done. Trial Tr. 288. His counsel told the Court at sentencing that Mr. Washington told him before trial that he was glad he was going to the jury "so he could tell them how sorry [he was]." Trial Tr. 400. The trial record also presents evidence that had he taken the stand, he may have asked the jury for the death penalty. During the sentencing phase, defense counsel told the judge that Mr. Washington "wanted to take the stand during trial to tell you and the jury that he wanted to be put to death." Trial Tr. 400.
Hence, it can be argued that the testimony Mr. Washington would have proffered would have been significantly more prejudicial than his lack of testimony. His testimony of remorse would not have provided any information to the jury that was not already before them for consideration, but it would have opened him up to cross-examination that could have confirmed his guilt and undermined his apparent remorse. Based on the trial record, therefore, Mr. Washington simply has not produced any evidence to this Court that he would have offered testimony that would have likely produced a different outcome of the proceeding. While he now attempts to suggest, based on his post-conviction hearing testimony, that he would have testified, if allowed at trial, to his absence of any memory of the crime and his history of blackouts to support a defense of diminished capacity, he cannot establish that the absence of that testimony prejudiced him; indeed, testifying to those matters, as found already by this Court, could well have prejudiced his case at trial.[19] As such, the petitioner cannot satisfy either the performance or the prejudice prong of the Strickland test and thus fails to establish an ineffective assistance of counsel claim based on a violation of his right to testify.
 REMAINING CLAIMS
The defendant also includes four other claims in his application for post-conviction relief. Mr. Washington asserts that (1) the State failed to disclose to the defense relevant evidence during discovery, (2) the Court erred in failing to protect the defendant's waiver of his right to testify, (3) the Court erred in finding aggravation and in its definition of "maliciousness," as it applies to aggravated battery, and (4) there was prejudicial under-representation of minorities in the composition of the jury.
The defendant's first claim alleges that the State failed to disclose toxicology reports and other tests from the defense until the middle of the trial. Specifically, the application raises the issue of the testimony of Officer Persson at trial regarding FBI analysis of the contents of the bucket. The defendant suggests that Mr. Casparian's original objection at trial to Officer Persson testifying about the contents of the bucket makes it clear that the State had withheld evidence. However, Officer Perrson, once the objection was overruled, testified that the FBI could not make any comparison of the contents of the bucket to anything else. His testimony was consistent with the FBI report provided to the defense during discovery. Once Officer Persson's testimony became clear, no further objection was made by Mr. Casparian, presumably because he realized that he actually had the information in discovery. Trial Tr. 173-174. Furthermore, there is no indication from the record before this Court that the State withheld any evidence from the defense. The defendant also has failed to provide this Court with any such evidence allegedly withheld by the State at trial. This Court will consider a possible Brady violation only when such allegation is substantiated with at least a credible indication that the evidence existed in the first place. See Brady v. Maryland, 373 U.S. 83 (1963).
Next, the defendant claims that the Court failed to protect his right to testify by engaging with the defendant in an on the record colloquy to ensure the defendant's waiver of his right to testify is knowing, intelligent, and voluntary. To support his claim, the defendant cites an Eleventh Circuit case, U.S. v. Van De Walker, 141 F.3d 1451 (11th Cir. 1998).
It is arguable that this claim of judicial error could have been raised at trial or on appeal and, not being raised, is waived here. See Statev. Carvalho, 450 A.2d 1102 (R.I. 1982). Assuming no waiver, however, there appears to be no requirement that the Court engage in such colloquy under Rhode Island law.
In 1989, when the waiver was made, the Rhode Island Supreme Court had not yet addressed whether such a colloquy was required. However, the majority rule at the time did not require the colloquy by the trial justice. Furthermore, though the Eleventh Circuit may have decided to impose such a requirement in limited circumstances that do not apply here, the Rhode Island Supreme Court explicitly rejected such a requirement in Brennan v. Vose. 764 A.2d 168, 171 (R.I. 2001). InBrennan, the Court agreed with the majority of jurisdictions that have declined "to require such an inquiry [by the trial justice], instead citing the responsibility of defense counsel, not the trial justice, to advise his or her client of the right to testify and advise the client whether, in counsel's opinion the client should testify and explain the advantages or disadvantages of such a decision" and also declined "to adopt or establish any such rule." Id. at 171, 172. It thus was not judicial error for the trial justice to refrain from engaging in a suasponte inquiry with the defendant regarding his waiver of his right to testify.
The defendant's third claim alleges error in Justice Caldarone's findings of aggravation and in the Court's definition of "malicious," as it applies to aggravation. However, these issues were addressed by the Rhode Island Supreme Court on appeal and rejected. State v. Washington,581 A.2d 1031, 1036 (R.I. 1990). In its decision denying the appeal, the Court concurred in the trial court's definitions of aggravated battery and torture and upheld the findings of both. Id. The Court also indirectly commented on the issue of malice by stating, "We believe that the sentence [life without parole, the possibility of which is triggered by a finding of aggravated battery or torture] may be imposed even when the resulting death is unintentional and the underlying felony was not intended as torture." Id. at 1035. The Court further commented, after recounting the facts of the crime, "On these facts alone we can gauge the depravity of the defendant's mind." Id. at 1036. The decision of the Court regarding Mr. Washington's appeal addressed the issues of aggravation and malice and upheld the decision of this Court. Therefore, consideration of these issues by this Court is barred.
Furthermore, to the extent that the application is critical of Mr. Casparian's actions or inactions in regards to challenging the application of aggravation in this case, it is clear from the record that a challenge was raised at both the penalty and sentencing phase, it was denied both times by the trial justice, and the denial was affirmed on appeal. Trial Tr. 340-343, 351, 396-398; Washington at 1035, 1036 (R.I. 1990).
The defendant's last allegation is that he was prejudiced by an under-representation of minorities in the composition of the jury. The defendant is required to raise any objections he may have regarding the composition of the jury prior to commencement of the trial. Failure to raise the issue before trial constitutes a waiver of the objection. Statev. Dionne, 442 A.2d 876, 882 (R.I. 1982); R.I. Super. Ct. R. Crim. P. 12(b)(2). Therefore, Mr. Washington has effectively waived his opportunity to have the Court address these claims in this proceeding.
Furthermore, the burden is on the defendant to show cause as to why relief from the waiver requirement should be granted notwithstanding his failure to comply with the Rule. State v. Roberts, 420 A.2d 837, 840
(R.I. 1980). Mr. Washington has failed to provide to this Court with any evidence regarding the composition of the jury or any substantial argument as to how he was prejudiced by its composition and so has failed to meet his burden in that regard.
For these reasons and those stated above, the defendant's motion for post-conviction relief is denied as to all his remaining claims.
 CONCLUSION
Mr. Washington wanted to testify at trial, just at he promised the Vicarios in his letters to them and as he testified at the post-conviction hearing, to tell them the truth about what happened. As he said, he wanted to talk not to the jury but to the victim's family. He wanted to ask the family for the death penalty. His interest in testifying had nothing to do with drugs or alcohol; it had nothing to do with blackouts or severe intoxication. While he had been drinking and doing drugs on the night in question, he was not so drunk or high as to not remember his preparation for, consummation of and flight from the rape. He remembered those events vividly, as evidenced by his confession to the police and the letters, months later, that contained words as to his raw feelings about his deed that it would be illogical to attribute to the police or to his simply repeating their story. His confession and the letters say nothing about a high level of intoxication or lack of memory; they are painfully detailed accounts of the crime, full of total recall and tortured remorse. The absence of any corroborating evidence of a blackout only reinforces this essential truth. That is why Mr. Casparian proclaimed at trial (in apparent outrage at having to deal with the defendant's first statement of blackout (unsworn) in the presentence report that was not made until after he had been convicted and could face life without parole) that "this is not a diminished capacity case."
It was not a diminished capacity case and Mr. Washington knew that. If it were such a case, he would not know whether he raped Alice Carcieri. Instead, he confessed to the police and the family that he did it.
Because it was not a diminished capacity case, Mr. Casparian had no reason to pursue forensic evidence of intoxication, and there is no evidence of any blood taken from the defendant near in time to the crime that could have been helpful. If the defendant's wife or others had any testimony helpful to proving blackouts or intoxication on the night in question, then surely they would have testified at the hearing. Without that defense, Mr. Casparian had to fight the case on legal grounds and on the issue of causation while arguing the defendant's remorse and acceptance of responsibility.
Putting the defendant on the stand could have added nothing to the defense that was not already there. After all, the defendant's real reason for testifying had nothing to do with the jury and everything to do with the family. There is no question, therefore, that Mr. Casparian would have done everything in his power to counsel the defendant not to take the witness stand.
At the beginning, it appears that he was not successful in this regard, given his best efforts, and had little expectation that he would be successful given the defendant's strong desire to tell the truth and to keep his promise to Alice's family. That's why Mr. Casparian told the jury in his opening statement that Mr. Washington would take the stand. But then the State put into evidence all of the defendant's statements and the overwhelming evidence of the defendant's guilt. These statements could be read to the jury in lieu of live testimony. They could serve to fulfill his promise to the family to tell the truth at trial. So Mr. Casparian attempted to convince the defendant, once again, that he should not take the stand. That's why he asked the Court for more time to recess. He would have told the defendant that he had already testified through his confession and the letters for the jury's benefit and that he could speak to the family later at sentencing. That is why the defendant agreed on the record to rest, why he never asked to testify thereafter and why he indeed spoke at sentencing.
Viewing this case now in this light makes it nearly impossible to characterize Mr. Casparian's performance as counsel as ineffective. Defense counsel was presented with a case of overwhelming evidence pointing to his client's guilt and very detailed confessions provided by his client to the police. In addition, his client wanted to take the stand to tell the jury to put him to death. Facing such a difficult case, defense counsel presented a zealous defense, challenging the interpretation of the felony murder statute and attempting to disprove the causation between the rape and the death, which was required for the State to prove the charge of felony murder. It is difficult to imagine what other course defense counsel could have taken, considering the evidence against his client and his client's willingness to concede his guilt.[20] His performance was admirable given the ship he had to steer between the shoals.
This case, at rock bottom, is not really about ineffective assistance of counsel. It is not really about blackouts or intoxication. It is not a case about a biased jury or errors at trial. It is not a case about who did the crime.
Knowing that he proved the case for the State at trial, Mr. Washington's pursuit of intoxication evidence and a new trial or sentence are simply his way of requiring the State (regardless of whether he is guilty) to prove him guilty of the crime on its own, without his confessions. By blaming Mr. Casparian and Justice Caldarone for errors at trial, and by waiting to bring those claims until after the death of his counsel and the retirement of the trial justice, Mr. Washington increases the likelihood that the State will be put through its paces. And he thinks that, without ever having to tell the truth from the witness stand, he just might prevail.
Yet Mr. Washington, this Court has reviewed all of your claims and rejects them. It finds that the truth as to these claims is what you said before and what the jury fairly found, with able assistance to you by counsel.
The Petition of Jeffrey Washington for Post-Conviction Relief is denied in its entirety.
[1] Given the retirement of the original trial justice in this matter, Justice Thomas J. Caldarone, Jr., this Court considers the instant Petition for Post-Conviction Relief under R.I. Super. Ct. R.P. 2.3 (d) (4).
[2] Statements were taken on December 26, 1987 from friends and family members present on the scene of the crime. Statements were taken from Vincent Vicario, Adevita Colletta, Stephen and Amy Soscia, and Carmella Hall. The other information provided by the witness statements is consistent with the summary provided in the police narrative.
[3] Statements of Officer Roy Persson, Patrolman Francis Duffy, Officer Kenneth Graves, and Detective John Cullen were provided. In addition, Officer Persson's statement details how he processed the scene and the results of analysis conducted on some of the items seized. It also documents how, on December 28, 1987, he obtained a fingerprint off the tuna fish can and matched it to Jeffrey Washington. The other information provided in the statements are consistent with the details provided in the police narrative.
[4] The first seizure report was filed by Sergeant Downing and was dated January 21, 1988. It states that Detectives Tucker and Cullen brought the defendant to the Identification Bureau, where he was photographed and fingerprinted. It also states that Mr. Washington was advised of his rights and consented to a search of his person. After the defendant signed the consent form, Sergeant Downing seized head and pubic hairs from the defendant, in addition to taking a photograph of a slip-knot tied by the defendant. The other two seizure reports, both filed by Detective Tucker, itemized two letters sent by Mr. Washington to the victim's family. The first report is dated January 25, 1988 and states that Alfred Hall turned over to the Providence Police a letter, postmarked January 20, 1988, from the defendant to Vincent Vicario. The second seizure report, dated March 21, 1988, states that Mr. Hall gave to the police another letter from the defendant to Mr. Vicario, postmarked February 23, 1988.
[5] The confession contains a waiver section with Mr. Washington's signature, indicating that he was knowing, intelligently and voluntarily waiving his Miranda rights and that the confession was voluntary.
[6] Another supplemental answer was provided on April 10, 1989. It provided the defense with a copy of a report by Robert Miller, a forensic chemist with the toxicology branch of the Rhode Island Department of Health. The report indicates that three vaginal, saliva, and rectal swabs were obtained from the victim as well as two vaginal, oral, and rectal smears. The vaginal smear tested positive for spermatozoa (male reproductive cells), but the other smears did not. All of the swabs tested negative for acid phosphatase (an enzyme found in seminal fluid). The Answer also indicated that Mr. Miller might testify as to his findings.
[7] Stipulation No. 1 states that FBI analysis on four items seized at the scene tested positive for human semen. These items were a pink nightgown, robe/housecoat, mattress pad, and bed sheet case, all belonging to the victim and marked as State's exhibits 17, 18, 20, and 21, respectively. Stipulation No. 2 concerns the findings of FBI analysis conducted on trace evidence secured from under the victim's bed (State's Exhibit No. 8) and on a white sheet (State's Exhibit No. 19). The analysis states that hairs found in the trace evidence were consistent with a sample of the defendant's hair. The stipulation also states that hair comparisons do not constitute a basis for absolute personal identification. Stipulation No. 3 states the findings of FBI analysis conducted on the letter, postmarked January 20, 1988, sent to Mr. Vicario from the defendant. The analysis identifies fingerprints on the letter as belonging to the defendant. The findings of the FBI analysis agreed upon by the parties in each of the stipulations are consistent with the reports given to the defense during pre-trial discovery.
[8] The exhibits introduced were photographs of the victim and the crime scene, the victim's nightgown, housecoat, bed sheets, mattress cover and pad, and quilted mattress pad. Other physical evidence introduced was the trace evidence (including hairs) vacuumed from under the bed, the bottle cap found on the bed, the ginger ale bottle and cans of food, and rope found in the cellar, as well as the rope used to bind the victim, and a photo of the bucket of the human waste found in the cellar. The State also introduced a photograph of the defendant, a photograph of the slip-knot tied by the defendant after he was in custody, the defendant's consent to search form, rights form, confession, and the letters the defendant wrote to Mr. Vicario.
[9] Specifically, the State called Adavita Colletta, who was the last of her friends to see the victim alive; Ann Harpin, the victim's sister and the person who discovered her body; Alfred Hall, the victim's brother-in-law who was present on the scene when the police arrived; and Elda Vicario, the victim's sister and the person who also had employed Mr. Washington to clean the victim's house. Mrs. Vicario also testified that keys to the back door were usually left sitting on the ledge to the entrance to her apartment. Trial Tr. 61.
[10] Specifically, the State called Patrolman Francis Duffy, who was the first police officer on the scene; Detectives Tucker and Cullen, who interviewed the defendant in New York and obtained the confession; Sergeant Downing, who obtained the consent to search form from the defendant and seized samples of the defendant's head hair; Detective Persson, with the Bureau of Criminal Identification, who collected the evidence at the scene and sent it to the FBI lab for analysis, along with the defendant's hair sample obtained from Sergeant Downing; and Roger Miller, who testified regarding his findings of analysis conducted on the vaginal, saliva, and rectal swabs and the vaginal, oral, and rectal smears, as reported in the State's second Supplemental Answer during discovery. The testimony of each of these witnesses was consistent with statements and reports produced during discovery.
[11] Aggravated battery was defined to the jury as "the malicious causing of bodily harm to another by depriving him or her of a member of his body or by rendering a member of his or her body useless or by seriously disfiguring his body or member thereof." Trial Tr. 350.
[12] Mr. Craven summarized for the Court comments made by the defendant to his probation officer at pre-sentencing: ". . . he doesn't understand why he ever done it or what role he had, and wanted a psychiatric examination and hypnosis, and he feels that in light of his past experience with using cocaine, how the hell could he ever have sustained sexual performance in light of all the drugs that he allegedly took." Trial Tr. 392.
[13] The petition was filed pursuant to the provision of the Act, codified at R.I.Gen. Laws § 10-9.1-1(a)(1).
[14] Copies of a letter from Ms. Hurst and of a letter from Mr. Casparian do appear in the Court file in this action. However, the letters do not contain sufficient information to confirm the contents of the defendant's inquiries to the Public Defender's Office.
[15] The Post-Conviction Relief Act also states that "any ground [for relief] finally adjudicated or not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the applicant has taken to secure relief, may not be the basis for a subsequent application, unless the court finds that in the interest of justice the applicant should be permitted to assert such a ground for relief."
[16] See discussion in Right to Testify section of this Decision.
[17] See discussion in Right to Testify section of this Decision.
[18] See discussion in Right to Testify and Diminished Capacity sections of this Decision.
[19] See discussion in Diminished Capacity section of this Decision.
[20] The trial record also evidences that counsel presented a vigorous defense. Throughout the trial, defense counsel conducted rigorous cross-examination of the witnesses and lodged objections at appropriate times. At the close of the State's case, defense counsel made a motion for judgment of acquittal, asserting a construction of the felony murder statute that would require the State to prove malice aforethought. After the jury delivered the verdict of guilty, defense counsel moved for an acquittal on the charges of aggravated battery and torture and attempted to prevent the charges from being considered by the jury. After the trial justice denied that motion, counsel made an impassioned argument to the jury as to why the evidence did not support a finding of aggravation. Before the jury considered the charges, the trial justice gave an instruction to the jury regarding aggravated battery and torture. Defense counsel objected to the charge. When the jury returned a verdict finding aggravated battery, defense counsel made a motion for a new trial. The motion was denied and ultimately the trial justice sentenced the defendant to life imprisonment without the possibility of parole. Then defense counsel filed a timely motion of appeal to the Rhode Island Supreme Court seeking a new trial for improperly admitted evidence or a reduction of sentence based on his construction of the felony murder statute and claiming that the punishment was inappropriate given the circumstances of the crime. See State v. Washington, 581 A.2d 1031, 1036
(R.I. 1990). The record thus displays evidence of defense counsel's zealous defense.